**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORIA ANDRETTA, *on behalf of herself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>LONG ISLAND PLASTIC SURGICAL GROUP, PC d/b/a NEW YORK PLASTIC SURGICAL GROUP,<br><br>Defendant. | Case No. 1:24-cv-4554<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Victoria Andretta, individually and on behalf of all those similarly situated, alleges the following against Long Island Plastic Surgical Group, PC dba New York Plastic Surgical Group, PC ("NYPSG" or "Defendant"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts and upon information and good faith belief as to all other matters based on the investigation conducted by and through her attorneys.

## INTRODUCTION

1.      NYPSG, which advertises itself as a "premier plastic surgery practice" and "among the most well-established plastic surgery practices in the nation," violates the privacy rights of visitors to and users of its website—accessible at <u>www.lipsg.com</u> (the "Website")—by using tracking technologies to collect and divulge their highly sensitive personal information without their informed consent.

2.      According to NYPSG, its "board-certified" plastic surgeons perform a range of procedures including breast augmentation, breast lift, liposuction, tummy tuck, rhinoplasty as well

as pediatric surgeries. And while it proclaims that its "entire team [] is committed to upholding the highest standards of patient care, including clear communication, patient safety, continuing education, and uncompromising professional medical ethics," NYPSG—unbeknownst to its Users—installed Facebook's Meta Pixel ("Meta Pixel" or "Pixel") and other invisible third-party tracking tools on its Website in order to intercept Users' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") to collect and divulge that Private Information to third parties in violation of the Health Information Portability and Accountability Act's ("HIPAA") Privacy Rule as well as state, federal and common law.

3.    Notably, these tracking tools are customizable and programmable meaning that NYPSG (the website owner) made the decisions regarding which of its webpages contain trackers, which events are tracked and transmitted to third parties like Facebook and Google and what confidential health information and communications from its patients and users is disclosed without consent.

4.    For instance, NYPSG made the decision to license the Meta Pixel—which is a piece of code that "tracks the people and [the] type of actions they take" as they interact with a website including how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box).[1]

5.    Once it signed with Facebook (which, upon information and good faith belief informed NYPSG not to send Private Information), NYSPG nonetheless configured the Meta Pixel to collect and disclose extensive amounts of User information including: (i) when they accessed the Website; (ii) the exact text of Users' search queries; (iii) the medical services and treatments

---

[1] *Retargeting*, https://www.facebook.com/business/goals/retargeting (last visited May 30, 2024).

sought; (iv) scheduling of appointments; (v) accessing and viewing the bill page; (vi) the text of URLs visited by the User and (vii) other information that is PII and PHI under the law.

6.     Together with their Private Information, the data sent to Facebook also discloses Users' unique and persistent Facebook ID ("Facebook ID" or "FID") which allows Facebook and other third parties to specifically identify those Users and associate their Private Information with their Facebook profile.[2] Users' FIDs are linked to their Facebook profiles which personally identifies them through a wide range of demographic and other information including their names, pictures, personal interests, work histories, relationship statuses and other details.[3]

7.     There is thus no anonymity in the information disclosed to Facebook (and others) as the Pixel collects and discloses a substantial "data packet" coupled with the FID so that NYPSG can, among other things, send targeted advertisements to Users based on their sensitive and protected Private Information. NYPSG also uses this impermissibly obtained data for analytics purposes to gain additional insights into how its patients use its Website.[4]

---

[2] Because the User's FID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the FID to quickly and easily locate, access and view the User's corresponding Facebook profile. To find the Facebook account associated with a particular c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

[3] Notably, the Pixel collects data *regardless* of whether the Website visitor has a Facebook account as Facebook maintains "shadow profiles" on users without accounts and links the information collected via the Pixel to the user's real-world identity using their shadow profile. *See* Russell Brandom, *Shadow Profiles Are The Biggest Flaw In Facebook's Privacy Defense*, TheVerge.com (Apr 11, 2018), *available at* https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy (last visited May 30, 2024).

[4] Upon information and good faith belief, NYPSG also installed and implemented Facebook's Conversions Application Programming Interface ("Conversions API" or "CAPI") on its servers. Unlike the Meta Pixel, which co-opts a website user's browser and forces it to disclose information to third parties in addition to the website owner, CAPI does not cause the User's browser to transmit information directly to Facebook. Rather, CAPI tracks the User's website interactions including Private Information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.

8.    The data in the "data packets" is then linked to a specific internet protocol address, which is itself protected information under HIPAA. The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.[5]

9.    As a healthcare provider and a covered entity, NYPSG has certain duties and obligations to its patients which it breached in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web Users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Facebook or other third parties; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the Pixels; (v) failing to warn Plaintiff and Class Members and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of Users' PII and PHI.

10.    In short, NYPSG's actions constitute an extreme invasion of Plaintiff's and Class Members' right to privacy and violate federal and state statutory and common law. Plaintiff and Class Members have suffered injury because of NYPSG's conduct including: (i) invasion of privacy, (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information, (iv) diminution of value of their Private Information, (v) statutory damages and (vi) the continued

---

[5] These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses. *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited May 30, 2024).

and ongoing risk to their Private Information.[6]

11.    The collection and use of this data raises serious concerns about User privacy and the potential misuse of personal information. For example, when Users navigate NYPSG's Website, every step of their activity is tracked and monitored. By analyzing this data using algorithms and machine learning techniques, Facebook (and other entities tracking this information) can learn a chilling level of detail about Users' medical conditions, behavioral patterns, preferences and interests.

12.    The data can be used not only to provide personalized and targeted content and advertising but also for more nefarious purposes such as tracking and surveillance. Moreover, the misuse of this data could potentially lead to the spread of false or misleading information, which could have serious consequences, particularly in the case of health-related information.

13.    As pointed out by the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS), impermissible disclosures of such data in the healthcare context "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI…. This tracking information could also be misused to promote misinformation, identity theft, stalking, and harassment."[7]

14.    Healthcare patients simply do not anticipate that their trusted healthcare provider

---

[6] The exposed Private Information of Plaintiff and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting or insurance companies utilizing the information to set insurance rates. Furthermore, third parties often offer for sale the unencrypted, unredacted Private Information to criminals on the dark web for use in fraud and cyber-crimes.

[7] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 30, 2024).

will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook or Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.

15.     Despite willfully and intentionally incorporating tracking tools,[8] NYPSG has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook, Google and/or other third parties. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with NYPSG via its Website (or stored on its servers to be later transmitted to Facebook) so it could be used for targeted advertising and marketing purposes, among other things.

16.     Plaintiff and Class Members who visited and used Defendant's Website thought they were communicating with ***only*** their trusted healthcare providers and reasonably believed that their sensitive and private PHI would be guarded with the utmost care. That is, in navigating NYPSG's Website—be it to search for specific procedures, locate a doctor with a specific specialty and/or find sensitive information about their medical treatment—Plaintiff and Class Members did not expect that every interaction with the website (including the exact pages each User visited), extremely sensitive PHI such as specific surgical procedures and treatment and/or their treating physician, would be intercepted, captured and otherwise shared with Facebook. Plaintiff continued to have her privacy violated when their Private Information was used to turn a profit by way of targeted advertising related to their medical procedures and treatments.

---

[8] NYPSG knew that by embedding the Meta Pixel on its Website it was permitting Facebook to collect and use Plaintiff' and Class Members' Private Information including sensitive medical information. In fact, Facebook business terms specifically warn healthcare entities not to configure the Meta Pixel to send Private Information.

17.    Plaintiff seeks to remedy these harms and bring individual and representative claims for (i) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use and disclosure; (ii) breach of fiduciary duty/confidentiality; (iii) unjust enrichment; (iv) negligence; (v) violation of the New York Deceptive Acts and Practices Act, Gen. Bus. Law § 349 ("NY GBL § 349") and (vi) constructive bailment.

## PARTIES

18.    Plaintiff Victoria Andretta is and was at all relevant times a resident of New York City, New York County in the State of New York.

19.    Defendant Long Island Plastic Surgical Group, PC d/b/a New York Plastic Surgical Group, PC is a professional corporation organized under the laws of the State of New York with its principal place of business located at 999 Franklin Avenue in Garden City, New York 11530. Defendant is a covered entity under HIPAA.

## JURISDICTION & VENUE

20.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than one or more Defendant.

21.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

22.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*

23.    Defendant is subject to personal jurisdiction in New York because Defendant is a domestic professional corporation organized and existing under the laws of the State of New York, maintains its principal place of business in New York and is authorized to conduct and is conducting business in New York.

24.    Venue is proper in this judicial district under 28 U.S.C § 1391 (a) through (d) because: (i) a substantial part of the events giving rise to this action occurred in this judicial district, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class members' Private Information; (ii) Defendant's principal place of business is located in this judicial district; (iii) Defendant collects and divulges Class members' Private Information in this judicial district and (iv) Defendant caused harm to Class members residing in this judicial district. Additionally, Plaintiff is a citizen of New York, resides in this judicial district and used Defendant's Website within this District.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCES

25.    Plaintiff Victoria Andretta began utilizing NYPSG's Website in or around March 2020.

26.    NYPSG encouraged Plaintiff Andretta to utilize its Website to search for doctors, research treatments, schedule appointments and research information specifically related to ███████████████████████████████████.

27.    While using the Website Plaintiff Andretta communicated sensitive—and what she expected to be confidential—personal and medical information to NYPSG including, but not limited to, information specifically related to ███████████████ .

28.    In addition to researching the rhinoplasty operation on the Website, in or around March 2020 Plaintiff Andretta utilized the Website to schedule a virtual consult for ██████████ ████████████ .

29.    As a result of the Meta Pixel NYPSG chose to install on its Website, this information was intercepted, viewed, analyzed and used by unauthorized third parties.

30.    Plaintiff Andretta accessed the Website on her phone and laptop in connection with receiving healthcare services from NYPSG.

31.    Plaintiff has used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period in this case.

32.    As a medical patient using NYPSG's health services, Plaintiff Andretta reasonably expected that her online communications with NYPSG were solely between herself and NYPSG, and that such communications would not be transmitted or intercepted by a third party.

33.    Plaintiff Andretta is an active Facebook user and has had a Facebook account since at least 2008.

34.    As a result of Defendant's use of the Meta Pixel, Plaintiff Andretta began receiving advertisements on Facebook relating to her particular medical condition and treatment, including ads for ███████████████████ .

35.    Plaintiff Andretta never consented to the use of her Private Information by third parties or to NYPSG enabling third parties, including Facebook, Google and others to access or interpret such information.

36.    Upon information and good faith belief, Plaintiff began receiving these ads after her PII and PHI concerning her medical conditions, including her search for ███████ ████████████████████████████ was disclosed by NYPSG through the Pixel to Meta. Meta then viewed and accessed this Private Information so that it could personally identify Plaintiff by connecting her c_user FID to her Facebook account.

37.    Meta also accesses the PHI disclosed by NYPSG so that it can use the specific medical information Plaintiff shared with NYPSG to identify specific targeted ads related to Plaintiff's medical condition to send to her Facebook account. After accessing and identifying the specific medical conditions it can target with ads, Meta then shares that information with other unauthorized third parties whose businesses and advertisements are related to those conditions.

38.    The following long-URLs or substantially similar URLs were sent to Meta via the Pixel when Plaintiff accessed the Website:



- ████████████████████████████████[9]

39.     Plaintiff Andretta would not have utilized Defendant's medical services and/or used its Website or would have paid much less for Defendant's services had she known that her Private Information would be captured and disclosed to third parties like Facebook without her consent.

## FACTUAL BACKGROUND

### A.    *The Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal.*

40.     This surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the HHS have—in recent months—reiterated the importance of and necessity for data security and privacy concerning health information.

41.     For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.**"[10]

---

[9] The full scope of NYPSG's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery.

[10] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited May 30, 2024).

42.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
>
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[11]

43.    Consistent with these proscriptions, the FTC recently imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo.

44.    The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a

---

[11] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

$100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[12]

45.    Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[13]

---

[12]    *See* How FTC Enforcement Actions Will Impact Telehealth Data Privacy, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (last visited Jan. 9, 2024); *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), available at www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited May 30, 2024); https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google (last visited May 30, 2024).

[13]    *Use of Online Tracking Technologies* (July 20, 2023), https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf (last visited May 31, 2024).

46.    The Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* ("HHS Privacy Bulletin"), that the transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[14]

47.    The HHS Privacy Bulletin *reminds* healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as Google Analytics or Pixels *only in a limited way*, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[15]

48.    The HHS Privacy Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies***

---

[14] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added) (last visited May 31, 2024). The original guidance was issued in December 2022 and was recently updated in March 2024.

[15] *See id.*

> ***collecting sensitive information, now more than ever, it is critical***
> ***for regulated entities to ensure that they disclose PHI only as***
> ***expressly permitted or required by the HIPAA Privacy Rule.***[16]

49.    The OCR has made it clear that information that is routinely collected by vendors on public-facing websites may be PHI, including unique identifiers such as IP addresses, device IDs, or email addresses.[17]

50.    The HHS Privacy Bulletin also identifies several harms that may result from an impermissible disclosure of an individual's PHI, including:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.
>
> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[18]

51.    According to HHS, "[s]ome regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps." The "information disclosed might include an

---

[16] *Id.* (emphasis added).

[17] *See id.*; *see also* Mason Fitch, *HHS Bulletin Raises HIPAA Risks for Online Tracking Vendors*, LAW360 (December 13, 2022), https://www.law360.com/articles/1557792/hhs-bulletin-raises-hipaa-risks-for-online-tracking-vendors?copied=1.

[18] *See* HHS Privacy Bulletin, *supra*, note 13 (internal citations omitted) (emphasis in original).

individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[19]

52.　　Individually identifiable health information ("IIHI") "collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[20]

53.　　Thus, when a regulated entity, again like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

54.　　Further, the HHS Privacy Bulletin makes clear that the use of tracking technologies on the public-facing or "unauthenticated" portion of a hospital's website can likewise result in the unlawful disclosure of PHI.  According to the HHS Privacy Bulletin, "in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[21]

55.　　For example, "if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[22]

56.     As a result, a healthcare provider like Defendant may not disclose PHI to a tracking technology vendor, like Meta, unless they have properly notified their Website Users and entered into a business associate agreement with the vendor in question.

57.     When Plaintiff communicated with Defendant regarding "treatment options" and other health-related information on Defendant's Website, the tracking tools embedded by Defendant including the Meta Pixel intercepted and disclosed those communications to Meta and Google in violation of HIPAA's Privacy Rule.

58.     Defendant disclosed Plaintiff's and Class Members' PHI without their consent and without a business associate agreement with Meta.

**B.      *The Unlawful Use of Invisible Tracking Codes by Healthcare Providers to Send Meta People's Data for its Advertising Business.***

59.     Meta operates the world's largest social media company whose revenue is derived almost entirely from selling targeted advertising.

60.     The Meta Pixel and other third-party tracking tools also collect and transmit information from Defendant that identifies a Facebook user's status as a patient and other health information that is protected by federal and state law. This occurs through tools that Facebook encourages its healthcare Partners to use including to upload patient lists to Facebook for use in its advertising systems.

61.     Meta associates the information it obtains via the Meta Pixel with other information regarding the User, using personal identifiers that are transmitted concurrently with other

---

[22] *Id.*

information the Pixel is configured to collect. For Facebook account holders, these identifiers include the "c_user" cookie IDs, which allow Meta to link data to a particular Facebook account. For both Facebook account holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser.

62.    Ad Targeting has been extremely successful due, in large part, to Facebook's ability to target people at a granular level.[23] One of its most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015. The Meta Pixel is a free and publicly available "piece of code" that third-party web developers can install on their website to "measure, optimize and build audiences for … ad campaigns."[24]

63.    Meta describes the Pixel as "a snippet of JavaScript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts.[25] Meta tells advertisers that the Meta Pixel will improve their Facebook advertising, including by allowing them to:

    a.    "optimize the delivery of your ads" and "[e]nsure your ads reach the people most likely to take action;" and

    b.    "create Custom Audiences from website visitors" and create "[d]ynamic ads [to] help you automatically show website visitors the products they viewed on your website—or related ones."[26]

---

[23] Natasha Singer, *What You Don't Know about How Facebook Uses Your Data* (April 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[24] *Meta Pixel* (2023), https://www.facebook.com/business/tools/meta-pixel.

[25] *Meta Pixel* (2023), https://developers.facebook.com/docs/meta-pixel/ (stating that the pixel "can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart").

[26] *Id.*



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

64.     Meta explains that the Pixel "log[s] when someone takes an action on your website" such as "adding an item to their shopping cart or making a purchase," and the user's subsequent action:

65.     The Meta Pixel is customizable and web developers can choose the actions the Pixel will track and measure on a particular webpage.

66.     Meta advises web developers to place the Pixel early in the source code[27] for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website.[28]

67.     Meta's "Health" division is dedicated to marketing to and servicing Meta's healthcare "Partners," which it defines to include businesses that use Meta's products including

---

[27] Source code is a collection of instructions (readable by humans) that programmers write using computer programming languages such as JavaScript, PHP, and Python. When the programmer writes a set or line of source code, it is implemented into an application, website, or another computer program. Then, that code can provide instructions to the website on how to function. *What is Source Code & Why Is It Important?* (July 19, 2023), https://blog.hubspot.com/website/what-is-source-code (last visited May 30, 2024).

[28] *Meta Pixel: Get Started* (2023), https://developers.facebook.com/docs/meta- pixel/get-started.

the Meta Pixel or Meta Audience Network tools to advertise, market or support their products and services.

68.    Meta works with hundreds of Meta healthcare Partners, using Meta Collection Tools to learn about visitors to their websites and leverage that information to sell targeted advertising based on patients' online behavior. Meta's healthcare Partners also use Meta's other ad targeting tools, including tools that involve uploading patient lists to Meta.

69.    Healthcare providers like Defendant encourage Plaintiff and Class Members to access and use various digital tools via its Website to, among other things, receive healthcare services in order to gain additional insights into its Users, improve its return on marketing dollars and, ultimately, increase its revenue.

70.    In exchange for installing the Pixels, Facebook provided Defendant with analytics about the advertisements it has placed as well as tools to target people who have visited its Website.

71.    Upon information and belief, Defendant and other companies utilized Plaintiff's and Class Members' sensitive information and data collected by the Meta Pixels on Defendant's Website in order to advertise to these individuals later on Meta's social platforms.

72.    If a healthcare provider, such as NYPSG, installs the Meta Pixel code as Meta recommends, patients' actions on the provider's website are contemporaneously redirected to Meta. For example, when a patient clicks a button to register for, or logs into or out of, a "secure" patient portal, Meta's source code commands the patient's computing device to send the content of the patient's communication to Meta while the patient is communicating with her healthcare provider. In other words, by design, Meta receives the content of a patient's portal log in communication immediately when the patient clicks the log-in button—even before the healthcare provider receives it.

73.     Thus, the Meta "pixel allows Facebook to be a silent third-party watching whatever you're doing,"[29] which in this case included the content of Defendant's patients' communications with its Website, including their PHI.

74.     For Facebook, the Pixel acts as a conduit of information, sending the information it collects to Facebook through scripts running in the User's internet browser, via data packets labeled with PII, including the User's IP address, the Facebook *c_user* cookie and third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.[30]

## C.     *Defendant Disclosed Patient Healthcare Information, Including Patient Status, in Violation of the HIPAA Privacy Rule.*

75.     Healthcare entities collecting and disclosing Users' Private Information face significant legal exposure under HIPAA, which applies specifically to healthcare providers, health insurance providers and healthcare data clearinghouses.[31]

76.     The HIPAA privacy rule sets forth policies to protect all individually identifiable health information ("IIHI") that is held or transmitted.[32] This is information that can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

---

[29] Jefferson Graham, *Facebook spies on us but not by recording our calls. Here's how the social network knows everything* (March 4, 2020), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/# (last visited May 31, 2024).

[30] The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users. *See* Maciej Zawadziński & Michal Wlosik, *What Facebook's First-Party Cookie Means for AdTech* (June 8, 2022), https://clearcode.cc/blog/facebook-first-party-cookie-adtech/ (last visited May 31, 2024).
[31] *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[32] The HIPAA Privacy Rule protects all electronically protected health information a covered entity like Defendant "created, received, maintained, or transmitted" in electronic form. *See* 45 C.F.R. § 160.103.

77.     Plaintiff's IIHI captured by the Pixel and sent to Meta included their unique personal identifiers such as their Facebook ID, IP address, device identifiers and browser "fingerprints."

78.     Defendant further violated the HIPAA Privacy Rule, among other statutory and common laws, because Plaintiff's PHI concerning her specific medical condition and/or treatment sought (such as ████████████████████████████████████████████) was disclosed to Meta by the Pixel and other third-party trackers embedded by Defendant on its Website. HIPAA also protects against revealing an individual's status as a patient of a healthcare provider.[33]

79.     Defendant unlawfully revealed Plaintiff's and Class Members' patient status to Facebook and likely other unauthorized third parties in violation of HIPAA when the Meta Pixel captured and disclosed Plaintiff's and Class Members' activity on patient-dedicated webpages of the Website.

**D.      Defendant Transmitted a Broad Spectrum of Plaintiff's & Class Members' Identifiable Health Information to Meta via the Meta Tracking Tools.**

80.     Every website is comprised of "Markup" and "Source Code." Markup consists of the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

---

[33] *See Guidance Regarding Methods for De-identification of PHI*, *supra*, note 5. The only exception permitting a healthcare provider to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. *See* 45 C.F.R. § 164.510(2).

81.    Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source Code is designed to be readable by humans and formatted in a way that developers and other users can understand.

82.    In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions including the ability to command a website user's browser to send data transmissions to third parties like Facebook, via the Meta Pixel (or other tracking codes).[34]

83.    The Pixel, embedded in its JavaScript Source Code on the Website, manipulates a User's browser by secretly instructing it to duplicate a User's communications (HTTP Requests) and sending those communications to Facebook.

84.    This occurs because the Pixel is programmed to automatically track and transmit Users' communications, and this occurs contemporaneously, invisibly, and without the Users' knowledge.

85.    NYPSG's Source Code essentially commands a patient's browser to re-direct their actions on the Website (characterized as "Event Data" by the Pixel), which contain PHI, through the HTTPS protocol to Meta at a Meta "endpoint," *i.e.*, a URL at a domain controlled by Meta that exists for the purpose of acquiring such information.[35]

---

[34] These Pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

[35] A URL is just the web address that your type in the address bar at the top of the screen or which appear in the address bar when you click on a link. It stands for *Uniform Resource Locator*. When you go to use Google, the URL that appears is google.com. And when you click on Google Maps, the URL changes to google.com/maps.  It is that extension to the URL, "maps" that provides additional pageview information that allows pixels and trackers to know more about your internet usage.

86.     The information NYPSG sends to Meta from its use of the Meta Pixel and other tracking tools includes, but is not limited to, the following:

- Searches for the User's medical symptoms and conditions, specific medical providers, and treatments sought

- Descriptive URLs that describe the categories of the Website, categories that describe the current section of the Website, and the referrer URL that caused navigation to the current page

- Communications a User exchanges through Defendant's Website by clicking and viewing webpages,   including communications about providers and specialists, conditions, and treatments, along with the timing of those communications.

87.     Thus, NYPSG is, in essence, handing patients a tapped device and once one of its webpages is loaded into the User's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the tap, which intercepts those communications—intended only for Defendant—and transmits those communications to unauthorized third parties such as Facebook.

88.     For example, when a patient visits the Website and travels to a web page with a descriptive URL, their browser automatically sends an HTTP request to Defendant's web server. The web server automatically returns an HTTP response, which loads the Markup for that particular webpage.

89.     The patient visiting this particular web page only sees the Markup, not the Defendant's source code or underlying HTTP Requests and Responses.

90.     In reality, Defendant's Source Code and underlying HTTP Requests and Responses share the patient's personal information with Facebook, including the fact that a User was looking for specific treatment for their medical condition(s)—along with the User's unique personal identifiers.

91.     The first screenshot below shows what a webpage from Defendant's Website looks like and how the Pixel works to disclose information to Meta, *Figure 1*:



92.     On the left-hand side of the screenshot is the page as it appears to any User visiting this webpage. Ther is the result the User would see if they went to the website header under "Procedures," clicked "Face," then "Rhinoplasty" and chose "Preparing."

93.     The right-hand side of the screenshot reveals some of the information Defendant is disclosing to Meta through the Pixel unbeknownst to the User.

94.     Below is a larger image of the right-hand side of the screenshot above. Though it appears to be code, a closer inspection makes it apparent that Defendant is disclosing PHI that the User is sharing with Defendant when they use the Website.

*Figure 2. An HTTP single communication session sent from the device to Facebook that reveals the User's descriptive URL ("rhinoplasty-new-york-nyc/#preparing"):*



95.     The next image below, taken during the same network session, demonstrates that Defendant is disclosing both PHI and personally identifiable information in the form of the c_user FID, which uniquely identifies an individual's Facebook account (as well as other cookies that Facebook is known to utilize to identify individuals).

*Figure 3. An HTTP single communication session sent from the device to Facebook at the same time as data in Figure 2 above, that reveals the User's descriptive URL along with the User's unique Facebook personal identifier (the c_user field) and other unique identifiers:*



96.     The highlighted portions reveal the information that Defendant is sharing with Meta. Beginning at the top, the "id=171253853636792" is the unique ID number of the Pixel installed by Defendant. Next to that is "PageView," a type of 'event' collected by the Pixel as the User navigates the Website and which shares the URL of the page that the User is visiting.

97.     Finally, on the top line, Defendant is disclosing that the User is visiting "www.lipsg.com/face/rhinoplasty-new-york-nyc/preparing."

98.     Through the "PageView event, Defendant is also disclosing to Meta the PHI of the User. Here, Defendant is disclosing that the User visited the webpage for "preparing" for a "rhinoplasty." Now Meta knows that the User has expressed interest in and sought information related to a specific medical procedure, i.e. personal health information that is protected by HIPAA.

99.     The last highlighted lines, which begin with "Cookie," contains the PII disclosed to Meta that allows Meta to specifically associate the PHI shared in the earlier lines with a specific individual.

100.     Specifically, the highlighted "c_user" cookie contains the unique Facebook User ID for the person who is visiting this webpage. Ther user ID, or FID, can be used to easily find the Facebook account of any user. If you have a person's FID (for example, FID 12345), all you have to do is add it to the Facebook URL to find the profile. In our example, the URL for this example would be: facebook.com/12345.

101.     Defendant discloses not only the type of treatment and/or service sought by the Users, but also their patient status ("new patient" or "returning"), the medical providers they are searching for, and even their gender orientation (for example, the fact that a User is searching for a specific type of transgender surgery).

***Figure 4. An HTTP single communication session sent from the device to Facebook that reveals the User is contacting Defendant as a new patient seeking a "cosmetic consult," along with the User's unique Facebook personal identifier (the c_user field):***



*Figure 5. An HTTP single communication session sent from the device to Facebook that reveals the User is searching for "facial" "transgender surgery," along with the User's unique Facebook personal identifier (the c_user field):*



102.      In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via Pixels or web bugs, effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties.

103.      Looking to the previous examples, Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) and sending those communications to Facebook.

104.      This occurs because the Pixel embedded in Defendant's Source Code is programmed to automatically track and transmit a patient's communications, and this occurs contemporaneously, invisibly, and without the patient's knowledge.

105.    Thus, without Users' consent, Defendant effectively uses this Source Code to commandeer patients' computing devices, thereby re-directing their Private Information to unauthorized third parties.

106.    The information that Defendant's Pixel sends to Facebook may include, among other things, patients' PII, PHI and other confidential information.

107.    Consequently, when Plaintiff and Class Members visit Defendant's Website and communicate their Private Information, it is transmitted to Facebook, including, but not limited to, patient status, health conditions experienced and treatments sought, physician selected, appointments sought, specific button/menu selections, and sensitive demographic information such as gender identity.

**E.    Defendant's Pixel Tracking Practices caused Plaintiff's and Class Members' Private Information to be sent to Facebook.**

108.    NYPSG utilizes Facebook's Business Tools and intentionally installs the Pixel and/or Conversion API, which transmits information via the Defendant's servers and first-party cookies (rather than patients' web browsers and third-party cookies) and can bypass ad blockers or consent denials, on its Website to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.

109.    NYPSG's web pages contain a unique identifier which indicates that the Meta Pixel is being used on a particular webpage.

110.    The Pixels allow NYPSG to optimize the delivery of advertisements, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

111.    However, NYPSG's Website does not rely on the Pixel to function.

112.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

113.    NYPSG did not disclose to Plaintiff and Class Members that their Private Information would be shared with Facebook as it was communicated to Defendant. Rather, Defendant represented the opposite. This prevents the provision of any informed consent by Plaintiff or Class Members to Defendants for the challenged conduct described herein.

114.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendants to disclose their Private Information to Facebook (or any other third-party), nor did they intend for Facebook to be a party to their communications with Defendant.  Defendant does not employ any form or click system whereby Plaintiff and Class Members provide their affirmative consent to Defendant agreeing, authorizing, or otherwise permitting Defendant to disclose their Private Information to Facebook (or any other third-party).

115.    Defendant's Pixels and CAPI sent sensitive Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatment and surgical procedures; (iv) sought providers and their specialties; and (v) web pages viewed.

116.    Importantly, the Private Information Defendant's Pixels sent to Facebook was sent alongside Plaintiff's and Class Members' personal identifiers, including patients' IP address and cookie values thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts.

117.    Through the Source Code deployed by Defendant, the cookies that they use to help Facebook identify patients include but are not necessarily limited to cookies named: "c_user," "datr," "fr," and "fbp."

118.    The "*c_user*" cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is composed of a unique and persistent set of numbers.

119.    A User's FID is linked to their Facebook profile, which generally contains a wide range of demographics and other information about the User, including pictures, personal interests, work history, relationship status, and other details.

120.    Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

121.    The "*datr*" cookie identifies the patient's specific web browser from which the patient is sending the communication.

122.    It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users.

123.    Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with her or her Facebook account from Facebook.

124.    The "*fr*" cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.[36]

---

[36] *See* Gunes Acar, *et al.*, *Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission* 16 (March 27, 2015), https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

125.    By way of example, if a patient uses the Website to look for medical treatments, they may select the "Procedures" tab, which takes them to the list of medical and surgical procedures offered by Defendant to Users.

126.    The User's selections and filters are transmitted to Facebook via the Meta Pixels, even if they contain the User's treatment, procedures, medical conditions, or related queries, without alerting the User, and the images *supra* confirm that the communications Defendant sends to Facebook contain the User's Private Information and personal identifiers, including but not limited to their IP address, Facebook ID, and datr and fr cookies, along with the search filters the User selected.

127.    For example, a patient can search for various care options and service providers.

128.    From the moment the patient begins to search any of the services under the "Procedures" tab, their selections or search parameters are automatically transmitted by the Pixel to Facebook along with the User's unique personal identifiers, as evidenced by Figures 1-3 *supra*.

129.    Finally, Defendant's website also shares with Facebook each time a website user books an appointment with Defendant.

***Figures 6-7. Defendant reveals that the User is contacting NYPSG to book an appointment:***





130.    A User who accesses Defendant's website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID, and other personal cookie values including the datr and fr cookies.

150.    When a User's browser has recently logged out of their Facebook account, Facebook compels the User's browser to send a smaller set of cookies:[37]

*Figure 8*



---

[37] The screenshot below serves as an example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here but pictured in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

151.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.22F[38] Facebook, at a minimum, uses the fr cookie to identify Users.23F[39]

152.    The fr cookie expires after ninety (90) days unless the User's browser logs back into Facebook.25F[40] If that happens, the time resets, and another ninety (90) days begins to accrue.

153.    The _fbp cookie expires after ninety (90) days unless the User's browser accesses the same website.26F[41]  If that happens, the time resets, and another ninety (90) days begins to accrue.

154.    The Facebook Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., Defendant.[42]

155.    A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[43]

156.    The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

---

[38] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited May 31, 2024).

[39] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last visited May 31, 2024).

[40] *Id*.

[41] *Id.*

[42]*First-Party Cookie*, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last visited May 31, 2024). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[43] *Third-Party Cookie*, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last visited May 31, 2024). This is also confirmable by tracking network activity.

157.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles.

158.    As shown in the figures above, Defendant sent these identifiers with the event data.

159.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Information, nor did she authorize any assistance with intercepting her communications.

160.    Plaintiff was never provided any written notice that Defendants disclosed hers or other Website users' Private Information, nor was she provided any means of opting out of such disclosures.

161.    Despite this, NYPSG knowingly and intentionally disclosed Plaintiff's Private Information to Facebook.

**F.    NYPSG's Website Sent Plaintiff's and Class Members' PHI to Facebook Along with Unique Personal Identifiers.**

162.    As described herein, Defendant's Meta Pixel (and other third-party trackers) sent sensitive Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatments or therapies; (iv) searches for doctors; (v) locations of facilities for treatment; and (vi) web pages viewed.

163.    Importantly, the Private Information NYPSG's Pixel sent to Facebook was sent alongside Plaintiff's and Class Members' personal identifiers, including patients' IP address and cookie values such as their unique Facebook ID, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts.

**G.      *NYPSG Violated Its Promises to Users & Patients to Protect Their Confidentiality.***

164.    Healthcare providers, including NYPSG, possess the capability to activate tracking Pixels on their websites to monitor and analyze every activity of their visitors. When such Pixel technology is enabled, these healthcare providers, by default, agree with Facebook's terms (by using Meta's Business Tools the health care provider or covered entity "represent[s] and warrant[s] that [it has] provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage"[44]) which necessitate an assertion from these entities that they have secured explicit consent from their patients, including Plaintiff, to relay their tracking data, communications, diagnosis, and other pertinent medical details to Facebook.

165.    After obtaining detailed and sensitive personal data of Plaintiff and Class Members from the Defendant's Website, Facebook groups individuals based on specific medical conditions, diagnosis, and other content of patients' communications with the healthcare providers. These categorizations lead to the creation of distinct "bundles" of users, such as "pregnant mothers," "individuals with diabetes," "persons diagnosed with breast cancer," and other categories. Leveraging these highly specific and sensitive categorizations, Facebook then uses them not only for internal marketing purposes, but also external marketing purposes – allowing to use this data by third parties, such as drug manufacturers, or even companies of products who target the individuals within these categories. This allows healthcare providers, Facebook, and other third parties to obtain data on users and send targeted advertisements directly to them based on their medical conditions. Such a calculated use of personal medical information for targeted advertising not only exploits the data gathered from NYPSG's digital platforms but also raises concerns about

---

[44] *Meta, Data Policy: Information from Partners, vendors and third parties* (Jan. 1, 2023), https://www.facebook.com/privacy/policy?subpage=1.subpage.4- InformationFromPartnersVendors.

the privacy of affected individuals, making them subjects of hyper-targeted advertising campaigns based on their personal health conditions.

166.    NYPSG does not have the legal right to use or share Plaintiff's and Class Members' data, as this information is protected by the HIPAA Privacy Rule. The Privacy Rule does not permit the use and disclosure of Private Information to Facebook for use in targeted advertising.[45]

167.    Beyond Defendant's legal obligations to protect the confidentiality of individuals' Private Information, Defendant's privacy policies and online representations affirmatively and unequivocally state that it does "not collect personal information automatically," and that it "will never use the statistical analytics tool [sic] to track or to collect any Personally Identifiable Information (PII) of visitors to our site."[46]

168.    Further, Defendant represents to Users that it will only disclose Private Information provided to it under certain circumstances, ***none of which apply here***.[47] Defendant's privacy policies do ***not*** permit Defendant to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes.

169.    In fact, NYPSG acknowledges in its HIPAA Policy that it must obtain Users' "written authorization"[48] to use their PHI for any purpose other than those specifically disclosed, none of which include disclosure to third parties like Facebook.

170.    Upon information and belief, NYPSG does not have a business associate agreement with Facebook, and none of the "limited circumstances" listed above apply here.

---

[45] *See* 45 C.F.R. § 164.502.

[46] *Privacy Policy*, https://www.lipsg.com/privacy-policy/ (last visited May 30, 2024).

[47] *Id.*

[48] *HIPAA Privacy Notice*, https://www.lipsg.com/privacy-policy/hipaa-privacy-policy/ (last visited May 31, 2024).

171.    Finally, in their HIPAA Policy, NYPSG acknowledges that it is "required by law to maintain the privacy of 'protected health information'" and that its patients "have the right to receive a notification, in the event there is a breach of your unsecured PHI, which requires notification under the Privacy Rule."[49]

172.    NYPSG failed to issue a notice that Plaintiff and Class Members' Private Information had been impermissibly disclosed to an unauthorized third party. In fact, Defendant **never** disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications, data, and Private Information with Facebook and other third parties.[50]

173.    NYPSG has unequivocally failed to adhere to a single promise vis-à-vis its duty to safeguard Private Information of their Users. NYPSG has made these privacy policies and commitments available on their websites. NYPSG included these privacy policies and commitments to maintain the confidentiality of its Users' sensitive information as terms of its contracts with those Users, including contracts entered with Plaintiff and the Class Members.

174.    In these contract terms and other representations to Plaintiff and Class Members and the public, NYPSG promised to take specific measures to protect Plaintiff's and Class Members' Private Information, consistent with industry standards and federal and state law. However, it failed to do so.

---

[49] *Id*.

[50] In contrast to NYPSG, several medical providers which have installed the Meta Pixel on their Website have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited May 31, 2024); Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* FIERCE HEALTHCARE (October 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (August 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

175.    Even non-Facebook users can be individually identified via the information gathered on the Website, like an IP address or personal device identifying information. This is precisely the type of information for which HIPAA requires the use of de-identification techniques to protect patient privacy.[51]

176.    Despite a lack of disclosure, NYPSG allowed third parties to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very information it promised to keep private, in order to bolster its profits.

**H.    *Plaintiff and Class Members Reasonably Believed That Their Confidential Medical Information Would Not Be Shared with Third Parties.***

177.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

178.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to NYPSG, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

179.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

180.    Plaintiff and Class Members relied to their detriment on Defendant's uniform representations and omissions regarding protection privacy, limited uses, and lack of sharing of their Private Information.

181.    Now that their sensitive personal and medical information is in possession of third parties, Plaintiff and Class Members face a constant threat of continued harm – including bombardment of targeted advertisements based on the unauthorized disclosure of their personal

---

[51] *Guidance Regarding Methods for De-identification of PHI*, *supra*, note 5.

data. Collection and sharing of such sensitive information without consent or notice poses a great threat to individuals by subjecting them to the never-ending threat of identity theft, fraud, phishing scams and harassment.

## I.      Plaintiff & Class Members Have No Way of Determining Widespread Usage of Invisible Pixels.

182.    Plaintiff and Class Members have no idea that NYPSG collects and utilizes their Private Information, including sensitive medical information, when they engage with Defendant's website which has Meta Pixels secretively incorporated in the background.

183.    Plaintiff and Class Members do not realize that tracking Pixels exist because they are invisibly embedded within NYPSG's web pages that users might interact with.[52]

184.    Patients and users of Defendant's Website do not receive any alerts during their usage stating that Defendant tracks and shares sensitive medical data with Facebook, allowing Facebook and other third parties to subsequently target all users of Defendant's website for marketing purposes.

185.    Plaintiff trusted NYPSG's Website when inputting sensitive and valuable Private Information. Had Defendant disclosed to Plaintiff that every click, every search, and every input of sensitive information was being tracked, recorded, collected, and ___**disclosed**___ to third parties, Plaintiff would not have trusted NYPSG's Website to input such sensitive information.

186.    NYPSG knew or should have known that Plaintiff would reasonably rely on and trust Defendant's promises regarding the tracking privacy and uses of their Private Information. Furthermore, any person visiting a health website has a reasonable understanding that medical

---

[52] FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

providers must adhere to strict confidentiality protocols and are bound not to share any medical information without their consent.

187.    By collecting and sharing Users' Private Information with Facebook and other unauthorized third parties, NYPSG caused harm to Plaintiff, Class Members, and all affected individuals.

188.    Furthermore, once Private Information is shared with Facebook, such information may not be effectively removed, even though it includes personal and private information.

189.    Plaintiff fell victim to NYPSG's unlawful collection and sharing of their sensitive medical information using the Meta Pixel tracking code on its Website.

### J.    NYPSG Knew Plaintiff's Private Information Included Sensitive Medical Information but Shared It with Facebook Regardless.

190.    By virtue of how the Meta Pixel works, *i.e.*, sending all interactions on a website to Facebook, Defendant was aware that by incorporating the Meta Pixel onto its Website, this would result in the disclosure and use of Plaintiff's and Class Members' Private Information, including sensitive medical information.

191.    Specifically, NYPSG was aware that its Users' Private Information would be sent to Facebook when they researched specific medical conditions and/or treatments, looked up providers, made appointments, and otherwise interacted with Defendant's Website.

192.    At all times relevant herein Meta notified its partners, including NYPSG, to have the rights to collect, use, and share user data before providing any data to Meta.[53] Although Meta's intent is questionable, Defendant had been on notice of this Pixel-tracking ever since it activated such Pixel technology on its Website.

---

[53] *See In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754, at *13-14 (N.D. Cal. Dec. 22, 2022).

193.    Meta changed this provision again in July 2022, while still requiring partners to have the right to share patient information with Meta:[54]

### How do we collect or receive this information from partners?

Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us.

These Partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. We require Partners to have the right to collect, use and share your information before giving it to us.

194.    NYPSG had the explicit option to disable the Pixel technology on their Website, but chose not to exercise this option, thereby continuing to share data with Facebook despite the availability of preventive measures.

**Information from partners.**

Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.

Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.

To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

---

[54] Meta, *Data Policy: Information from Partners, vendors and third parties* (Jan. 1, 2023), https://www.facebook.com/privacy/policy?subpage=1.subpage.4- InformationFromPartnersVendors.

195.    Meta advised third party entities, like Defendant, to refrain from sending any information they did not have the legal right to send and expressly emphasized not to transmit health information. Yet, NYPSG, in direct contravention of these disclosures, and more importantly despite NYPSG's promises to keep all health-related data about patients confidential, continued to employ Pixel tracking on its Website, thereby sharing sensitive patient data without proper authorization or consent.

### K.    *Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their Private Information, Especially with Respect to Sensitive Medical Information.*

196.    Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information, including personal information and sensitive medical information.

197.    HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.

198.    HIPAA also requires that covered entities implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

199.    This federal legal framework applies to health care providers, including Defendant.

200.    Given the application of HIPAA to Defendant, Plaintiff and the members of the Class had a reasonable expectation of privacy over their PHI.

201.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the collection and unauthorized disclosure of sensitive medical information from millions of individuals, as NYPSG has done here, violates expectations of privacy that have been established as general societal norms.

202.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

203.    For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[55]

204.    Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[56]

205.    Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[57]

206.    Medical data is particularly even more valuable because unlike other personal information, such as credit card numbers which can be quickly changed, medical data is static.

---

[55] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds* (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[56] *Americans* and *Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information* (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[57] Margaret Taylor, *How Apple Screwed Facebook* (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

This is why companies possessing medical information, like NYPSG, are intended targets of cyber-criminals.[58]

207.    Patients using Defendant's Website must be able to trust that the information they input including their physicians, their health conditions and courses of treatment will be protected. Indeed, numerous state and federal laws require this.

208.    And these laws are especially important when protecting individuals with particular medical conditions that can and do subject them to regular discrimination. Furthermore, millions of Americans keep their health information private because it can become the cause of ridicule and discrimination. For instance, despite the anti-discrimination laws, persons living with HIV/AIDS are routinely subject to discrimination in healthcare, employment, and housing.[59]

209.    The concern about sharing medical information is compounded by the reality that advertisers view this type of information as particularly high value. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.

210.    As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[60] The article continues, "[c]hildren today are the very first generation of citizens to be datafied from before birth, and we cannot foresee — as yet — the social and political consequences of this historical transformation. What is particularly worrying

---

[58] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card* (September 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

[59] Bebe J. Anderson, JD, *HIV Stigma and Discrimination Persist, Even in Health Care*, AMA J. ETHICS (December 2009), https://journalofethics.ama-assn.org/article/hiv-stigma-and-discrimination-persist-even-health-care/2009-12.

[60] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth* (January 14, 2021), https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[61]

211.    Other privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you are charged on loans, and leave you vulnerable to workplace discrimination.[62]

212.    Defendant surreptitiously collected and used Plaintiff's and Class Members' Private Information, including highly sensitive medical information, through Meta Pixel in violation of Plaintiff's and Class Members' privacy interests.

## L.    Plaintiff's & Class Members' Private Information Has Substantial Value.

213.    Plaintiff's and Class Members' Private Information had value, and Defendant's disclosure and interception harmed Plaintiff and the Class by not compensating them for the value of their Private Information and in turn decreasing the value of their Private Information.

214.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

---

[61] *Id.*

[62] *See* Class Action Complaint, *Jane Doe v. Regents of the Univ. of Cal. d/b/a UCSF Medical Center* (Feb. 9, 2023), https://www.classaction.org/media/doe-v-regents-of-the-university-of-california.pdf.

215.    The robust market for Internet user data has been analogized to the "oil" of the tech industry.[63] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[64] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

216.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

217.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[65]

218.    Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

219.    In 2023, the Value Examiner published a report that focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical

---

[63]  *See The world's most valuable resource is no longer oil, but data*, https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited May 25, 2024).

[64]  *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited May 25, 2024).

[65] *See 10 Apps for Selling Your Data for* Cash, https://wallethacks.com/apps-for-selling-your-data/ (last visited May 25, 2024).

patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[66]

220.    In 2021, Trustwave Global Security published a report entitled *Hackers, breaches and the value of healthcare data*. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[67]

221.    The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "*How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[68]

222.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."75F[69]

223.    The dramatic difference in the price of healthcare data when compared to other forms of private information that is commonly sold is evidence of the value of PHI.

---

[66]*See                    Valuing                Healthcare                    Data*, https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last visited May 25, 2024).

[67] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing *The Value of Data*,                                                                      https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited May 25, 2024).

[68] *See* https://time.com/4588104/medical-data-industry/ (last visited May 25, 2024).

[69]  *See*  https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited May 25, 2024).

224.     But these rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

225.     In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

**M.     *Unique Personal Identifiers are Protected Health Information.***

226.     While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[70]

227.     The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted, and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

228.     These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[71]

229.     NYPSG improperly disclosed Plaintiff's and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited to the Pixel Information Recipients through their use of the Pixels

---

[70] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook* (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (last visited May 25, 2024).

[71] *Guidance regarding Methods for De-identification of PHI, supra*, note 5.

*in addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

230.    An IP address is a number that identifies the address of a device connected to the Internet. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites and third-party tracking companies to facilitate and track Internet communications.

231.    Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

232.    Facebook, Google and other third-party marketing companies track IP addresses to target individual homes and their occupants with advertising.

233.    Under HIPAA, an IP address is considered personally identifiable information, which is defined as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. See 45 C.F.R. § 164.514 (2).

234.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); see also 45 C.F.R. § 164.514(b)(2)(i)(O).

235.    Consequently, NYPSG's disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

**N.    NYPSG was Enriched & Benefitted from the Use of the Pixel & Other Tracking Technologies.**

236.    One of the primary reasons that NYPSG decided to embed Pixels and other tracking technologies on its Web Properties was to improve marketing by creating campaigns that maximize conversions and thereby decrease costs to NYPSG and boost its revenues.

237.    After receiving individually identifiable patient health information communicated on NYPSG's Web Properties, Facebook forwards this data, and its analysis of this data, to NYPSG.

238.    NYPSG then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Web Properties.

239.    NYPSG also receives an additional commercial benefit from using Facebook's tracking tools, such as the Meta Pixel and Conversions API, namely being able to serve more targeted advertisements to existing and prospective patients on their Meta accounts such as Facebook and Instagram.

240.    Facebook advertises its Pixel as a piece of code "that can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting. And when you use the Conversions API alongside the Pixel, it creates a more reliable connection that helps the delivery system *decrease your costs*."[72]

241.    Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[73]

242.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking

---

[72] *What is the Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel (emphasis added) (last visited May 25, 2024).

[73] *The complex world of healthcare retargeting,* https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting (last visited May 25, 2024).

technologies and the Pixel embedded on, in this case, NYPSG's Web Properties. For example, when a User searches for doctors or medical conditions or treatment on NYPSG's Web Properties, that information is sent to Facebook. Facebook can then use its data on the User to find more users to click on a NYPSG ad and ensure that those users targeted are more likely to convert.[74]

243.    Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[75]

244.    Plaintiff's and Class Members' Private Information has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

245.    In exchange for disclosing the Private Information of their account holders and patients, NYPSG is compensated by the Pixel Information Recipients in the form of enhanced advertising services and more cost-efficient marketing on their platform.

246.    But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[76]

---

[74] *See, e.g.*, *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking (last visited May 25, 2024).

[75] *Id*.

[76] *See The guide to HIPAA compliance in analytics,* https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited May 25, 2024).

247.    For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[77]

248.    Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[78]

249.    Whether a user has a Facebook profile is not indicative of damages because Facebook creates shadow profiles, and at least one court has recognized that the pixels' ability to track comprehensive browsing history is also relevant. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078–79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from websites and Google Cookies that it collects across the internet on the same user).

250.    NYPSG retargeted patients and potential patients, including Plaintiff and Class Members.

251.    Thus, utilizing the Pixels directly benefits NYPSG by, among other things, reducing the cost of advertising and retargeting.

---

[77] *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking*, *supra*, note 74.

[78] *The complex world of healthcare retargeting, supra*, note 73.

**O.      Plaintiff's Private Information is Extremely Valuable.**

252.    Plaintiff's and Class Members' Private Information had value, and NYPSG's disclosure and interception harmed Plaintiff and the Class by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

253.    Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

254.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

255.    The robust market for Internet user data has been analogized to the "oil" of the tech industry.[79] A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge."[80] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

256.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).[81] That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

---

[79] *See* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited May 25, 2024).

[80] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited May 25, 2024).

[81] *See What Your Data is Really Worth to Facebook* (Jul. 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/ (last visited May 25, 2024).

257.    Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[82]

258.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[83]

259.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

260.    Courts recognize the value of personal information and the harm when it is disclosed without consent. *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that Plaintiff's allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

---

[82] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[83] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/ (last visited May 25, 2024).

261.    Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

262.    Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

263.    The value of health data is well-known and various reports have been conducted to identify its value.

264.    Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."84

265.    Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).85

266.    The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a

---

84See https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthc are%20Data.pdf (last visited May 25, 2024).

85 See https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited Jan. 9, 2024)                    (citing                    https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[86]

267.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[87]

268.    The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

269.    These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

270.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

271.    NYPSG gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

272.    The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

273.    Plaintiff and Class Members have a continuing interest in ensuring that their future communications with NYPSG are protected and safeguarded from future unauthorized disclosure.

---

[86] *See* https://time.com/4588104/medical-data-industry/ (last visited May 25, 2024).

[87] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited May 25, 2024).

## TOLLING, CONCEALMENT & ESTOPPEL

274.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

275.    NYPSG secretly incorporated the Meta Pixel into its Website, providing no indication to Users that their User Data, including their Private Information, would be disclosed to unauthorized third parties.

276.    NYPSG had exclusive knowledge that the Meta Pixel was incorporated on its Website, yet failed to disclose that fact to Users, or inform them that by interacting with its website Plaintiff's and Class Members' User Data, including Private Information, would be disclosed to third parties, including Facebook.

277.    Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of Meta Pixels is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook to intercept Users' Private Information.

278.    The earliest Plaintiff and Class Members could have known about Defendant's conduct was shortly before the filing of this Complaint.

279.    As alleged above, NYPSG has a duty to disclose the nature and significance of its data disclosure practices but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

## CLASS ALLEGATIONS

280.    **Class Definition:** Plaintiff brings this action on behalf of herself and on behalf of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

281.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Website.

282.    The New York sub-class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the State of New York whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Website.

283.    The Nationwide Class and the New York Class are referred to collectively as the "Classes."

284.    The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

285.    Plaintiff reserves the right under Federal Rule of Civil Procedure 23 to amend or modify the Classes to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues. Plaintiff reserves the right under Federal Rule of Civil Procedure 23(c)(4) to seek certification of particular issues.

286.    The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

287.    **Numerosity:** The exact number of Class Members is not available to Plaintiff, but it is clear that individual joinder is impracticable. Thousands of people have used Defendant's Website during the Class Period. Members of the Class can be identified through Defendant's records or by other means.

288.    **Commonality:** Commonality requires that the Class Members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Class Members as to whether Defendant disclosed to third parties their Private Information without authorization or lawful authority.

289.    **Typicality:** Plaintiff's claims are typical of the claims of other Class Members in that Plaintiff and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct and data sharing practices.

290.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's claims are made in a representative capacity on behalf of the Class Members. Plaintiff has no interests antagonistic to the interests of the other Class Members. Plaintiff has retained competent counsel to prosecute the case on behalf of Plaintiff and the Class. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class members.

291.    The declaratory and injunctive relief sought includes but is not limited to:

a.    Entering a declaratory judgment against Defendant—declaring that Defendant's interception of Plaintiff's and Class Members' Private Information among themselves and other third parties is in violation of the law;

b.    Entering an injunction against Defendant:

    i.   preventing Defendant from sharing Plaintiff's and Class Members' Private Information among themselves and other third parties;

   ii.   requiring Defendant to alert and/or otherwise notify all users of its Website of what information is being collected, used, and shared;

  iii.   requiring Defendant to provide clear information regarding its practices concerning data collection from the users/patients of Defendant's Website, as well as uses of such data;

  iv.   requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and/or other third parties, and request Facebook/third parties to remove such information

   v.   and requiring Defendant to provide an opt out procedure for individuals who do not wish for their information to be tracked while interacting with Defendant's Website.

292.   **Predominance:** There are many questions of law and fact common to the claims of Plaintiff and Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions and/or issues for Class members include, but are not necessarily limited to the following:

    i.   Whether Defendant's unauthorized disclosure of Users' Private Information was negligent;

   ii.   Whether Defendant owed a duty to Plaintiff and Class Members not to disclose their Private Information to unauthorized third parties;

  iii.   Whether Defendant breached its duty to Plaintiff and Class Members not to disclose their Private Information to unauthorized third parties;

  iv.   Whether Defendant represented to Plaintiff and the Class that it would protect Plaintiff's and the Class Members' Private Information;

   v.   Whether Defendant violated Plaintiff's and Class Members' privacy rights;

  vi.   Whether Defendant's practices violated the New York Deceptive Practices Act, Gen. Bus. Law § 349;

vii.  Whether Plaintiff and Class Members are entitled to actual damages, enhanced damages, statutory damages, and other monetary remedies provided by equity and law;

viii. Whether injunctive and declaratory relief, restitution, disgorgement, and other equitable relief is warranted.

293.  **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual Class Members to obtain effective relief from Defendant's misconduct. Even if Class Members could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

294.  Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether Defendant misrepresented that it would disclose personal information only for limited purposes that did not include purposes of delivering advertisements or collecting data for commercial use or supplementing consumer profiles created by data aggregators and advertisers;

b.  Whether Defendant's privacy policy misrepresented that it collected and shared User information with third-party service providers only for the limited purpose of providing access to its services;

c.  Whether Defendant misrepresented that it had in place contractual and technical protections that limit third-party use of User information and that it would seek User consent prior to sharing Private Information with third parties for purposes other than provision of its services;

d.  Whether Defendant misrepresented that any information it receives is stored under the same guidelines as any health entity that is subject to the strict patient data sharing and protection practices set forth in the regulations propounded under HIPAA;

e.  Whether Defendant misrepresented that it complied with HIPAA's requirements for protecting and handling Users' PHI;

f.  Whether Defendant shared the Private Information that Users provided to Defendant with advertising platforms, including Facebook, without adequate notification or disclosure, and without Users' consent, in violation of health privacy laws and rules and its own privacy policy;

g.  Whether Defendant integrated third-party tracking tools, consisting of automated web beacons ("**Pixels**") in its website that shared Private Information and User activities with third parties for unrestricted purposes, which included advertising, data analytics, and other commercial purposes;

h.  Whether Defendant shared Private Information and activity information with Facebook using Facebook's tracking Pixels on its website without Users' consent;

i.  Whether Facebook used the information that Defendant shared with it for unrestricted purposes, such as selling targeted advertisements, data analytics, and other commercial purposes.

**NEW YORK LAW APPLIES TO THE COMMON LAW CLAMIS**

295.  The State of New York has a significant interest in regulating the conduct of businesses operating within its borders.

296.  New York, which seeks to protect the rights and interests of New York and all residents and citizens of the United States against a company headquartered and doing business in

New York, has a greater interest in the claims of Plaintiff and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

297.    The principal place of business and headquarters of NYPSG, located at 999 Franklin Avenue in Garden City, New York, is the "nerve center" of its business activities – the place where its high-level officers direct, control and coordinate Defendant's activities, including major policy decisions.

298.    Defendant's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in New York.

299.    NYPSG's breaches of duty to Plaintiff and Class Members emanated from New York.

300.    Application of New York law to the Class with respect to Plaintiff's and Class Members' claims is neither arbitrary nor fundamentally unfair because New York has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Class.

301.    Under New York's choice of law principles, which are applicable to this action, the common law of New York applies to the nationwide common law claims of all Class Members.

302.    Additionally, given New York's significant interest in regulating the conduct of businesses operating within its borders, and that New York has the most significant relationship to NYPSG, as it is headquartered in New York, and its executives and officers are located and made decisions which have given rise to the allegations and claims asserted herein, in New York, there is no conflict in applying New York law to non-resident consumers such as some of the potential Class Members.

## CLAIMS

### COUNT ONE

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2511(1), *et seq.*
### UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE
### *(On Behalf of Plaintiff & the Nationwide Class)*

303.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

304.    The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

305.    The ECPA protects both sending and receipt of communications.

306.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

307.    The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

308.    The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

309.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

310.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

311.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

312.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

313.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    Plaintiff's and Class Members' browsers;

    b.    Plaintiff's and Class Members' computing devices;

    c.    Defendant's web-servers and

    d.    The Pixel and other tracking technologies deployed by Defendant to effectuate the sending and acquisition of patient communications.

314.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Meta Pixel (and other third-party tracking codes) imbedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

315.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Meta Pixel embedded on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

316.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code embedded on its Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

317.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medical procedures and services, and scheduling.

318.    Additionally, through the above-described Meta Pixel (and other tracking technologies) and intercepted communications, this information was, in turn, used by third parties, such as Facebook, to 1) place Plaintiff in specific health-related categories and 2) target Plaintiff with particular advertising associated with Plaintiff's specific health conditions.

319.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

320.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

321.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

322.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

323.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

324.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

325.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of HIPAA, the New York Deceptive Practices Act, GBL § 349, and invasion of privacy, among others.

326.    **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.** The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

327.   Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

1.   Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a third party. HIPAA defines IIHI as:

> 1.   any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) ***relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual***, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[88]

> 2.

2.   Plaintiff's information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiff's expectations of privacy, and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Defendant used the wire or electronic

---

[88] § 1320d-(6) (emphasis added).

communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

3.      The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

4.      Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

   a.   Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

   b.   Disclosed IIHI to Facebook and Google without patient authorization.

5.      Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

6.      Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause Facebook pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiff's and Class members' computing devices as "first-party" cookies that are not blocked.

7.      The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

8.      Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

9.      Defendant's scheme or artifice to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above, including the statements and omissions recited in the claims below and (b) the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

10.      Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiff's and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

11.      As such, Defendants cannot viably claim any exception to ECPA liability.

12.      Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

   a.  Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

   b.  Defendant received substantial financial benefits from its use of Plaintiff's and Class

Members' individually identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c.  Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members;

d.  Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.  The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

328.    As a result of Defendant's violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**

**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiff & the Nationwide Class)***

329.    Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

330.    Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information.

This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

331.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

332.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

333.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its tracking tools such as the Pixel and other third-party trackers to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

334.    These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

335.    The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to

establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

336.    The third-party recipients included, but may not be limited to, Facebook and Google. Such information was received by these third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

337.    Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

a.    by failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b.    failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c.    failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d.    failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members' PHI;

e.    failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.    failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g.    impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*;

    h. failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

    i. failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

    j. failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f) and

    k. failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 4410(2).

338. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of Private Information and erosion of the essential confidential relationship between the healthcare provider and the patient.

339. As a direct and proximate cause of NYPSG's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that (a) sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; (b) Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Teladoc eroded the essential confidential nature of health services that Plaintiffs and Class Members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class Members and the obtaining of a benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class members for the unauthorized use of such data; (g) diminishment of the value of

Plaintiffs' and Class Members' Private Information; and (h) violation of property rights Plaintiffs and Class Members have in their Private Information.

**COUNT III**

**UNJUST ENRICHMENT**
***(On behalf of Plaintiff & the Nationwide Class)***

150.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

151.    Defendant benefitted from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

152.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

153.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

154.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

155.    The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

156.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT IV

### NEGLIGENCE
### *(On behalf of Plaintiff & the Nationwide Class)*

157.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

158.    Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

159.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

160.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

161.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

162.    The third-party recipients included, but may not be limited to, Facebook.

163.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information, and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

## COUNT V

### VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES, GEN. BUS. LAW § 349
*(On behalf of Plaintiff & the Nationwide Class or in the alternative, the New York Subclass)*

164.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the Nationwide Class, or, in the alternative, on behalf of the proposed New York Subclass.

165.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by:

a. promising to maintain the privacy and security of Plaintiff's and Class Members' PHI as required by law;

b. installing the Meta Pixel to operate as intended and transmit Plaintiff's and Class Members' Private Information without their authorization to Facebook;

c. failing to disclose or omitting material facts to Plaintiff and Class Members regarding the disclosure of their Private Information to Facebook;

d. failing to take proper action to ensure the Pixel was configured to prevent unlawful disclosure of Plaintiff's and Class Members' Private Information;

e. unlawfully disclosing Plaintiff's and Class Members' Private Information to Facebook.

166. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

167. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant knew it failed to disclose to Plaintiff and Class Members that their healthcare-related communications via the Web Properties would be disclosed to Facebook.

168. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant intended that Plaintiff and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

169. Specifically, Defendant was aware that Plaintiff and Class Members depended and relied upon it to keep their communications confidential, and Defendant instead disclosed that information to Facebook.

170. In addition, Defendant's material failure to disclose that Defendant collects Plaintiff's and Class Members' Private Information for marketing purposes with Facebook constitutes an unfair act or practice prohibited by the NY GBL § 349. Defendant's actions were immoral, unethical and unscrupulous.

171.    Plaintiff had reasonable expectations of privacy in her communications exchanged with Defendant, including communications exchanged at https://www.lipsg.com.

172.    Plaintiff's reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Policy and HIPAA Privacy Notice.

173.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant deployed the Pixel to disclose and transmit Plaintiff's personally identifiable, non-public medical information and the contents of her communications exchanged with Defendant to third parties, *i.e.*, Facebook and/or Google.

174.    Defendant's disclosures of Plaintiff's and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

175.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

176.    Defendant willfully, knowingly, intentionally and voluntarily engaged in the aforementioned acts when it incorporated the Facebook Pixel with knowledge of the Pixel's purpose and functionality.

177.    The harm described herein could not have been avoided by Plaintiff and Class Members through the exercise of ordinary diligence.

178.    As a result of Defendant's wrongful conduct, Plaintiff was injured in that she never would have provided her PII and PHI to Defendant, or purchased Defendant's services, had she known or been told that Defendant shared her confidential and sensitive Private Information with Facebook and/or Google.

179.    As a direct and proximate result of Defendant's multiple, separate violations of the NY GBL § 349, Plaintiff and Class member have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiff and Class Members would not have made had they known of Defendant's disclosure of their PII and PHI to Facebook; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

180.    Defendant's acts, practices and omissions were done in the course of Defendant's business of furnishing healthcare-related services to consumers in the State of New York.

181.    Plaintiff bring this action on behalf of herself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from Defendant's unfair, deceptive and unlawful practices. Defendant's wrongful conduct as alleged in this Amended Complaint has had widespread impact on the public at large.

182.    As a result, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## COUNT VI

### CONSTRUCTIVE BAILMENT
### *(On Behalf of Plaintiff & the Nationwide Class)*

183.    Plaintiff repeats and re-alleges each and every allegation contained in the Amended Complaint as if fully set forth herein.

184.    NYPSG acquired and was obligated to safeguard the Private Information of Plaintiff and Class Members.

185.    NYPSG accepted possession and took control of Plaintiff's and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

186.    Specifically, a constructive bailment arises when NYPSG, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

187.    Constructive bailments do not require an express assumption of duties and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously or by mistake as to the duty or ability of the recipient to affect the purpose contemplated by the absolute owner.

188.    During the bailment, NYPSG owed a duty to Plaintiff and Class Members to exercise reasonable care, diligence and prudence in protecting their Private Information.

189.    NYPSG breached its duty under the constructive bailment by failing to take appropriate measures to safeguard and protect Plaintiff's and Class Members' Private Information, resulting in the unlawful and unauthorized access to, disclosure and misuse of such Information by third parties such as Facebook.

190.    NYPSG further breached its duty to safeguard Plaintiff's and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been disclosed to third parties without Plaintiff's and Class Members' knowledge, consent or explicit authorization.

191.    As a direct and proximate result of NYPSG's breach of its constructive bailment, Plaintiff and Class Members have suffered compensable damages that were reasonably foreseeable

to NYPSG, including but not limited to, the damages set forth herein, and they remain at imminent risk of suffering additional damages in the future.

192.    Accordingly, Plaintiff and Class Members have been injured as a result of NYPSG's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Andretta, on behalf of herself and all others similarly situated, respectfully prays for judgment in her favor and against Defendant New York Plastic Surgery Group as follows:

A.  For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  For an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

F.  For an award of punitive damages, as allowable by law;

G.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H.  Pre- and post-judgment interest on any amounts awarded and

I.  All such other and further relief as this Honorable Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff Andretta demands a jury trial on all triable issues.

Date: June 14, 2024

Respectfully submitted,

*/s/ Matthew J. Langley*
Matthew J. Langley
New York Bar No. 4831749
David S. Almeida
New York Bar No. 3056520
Elena A. Belov
New York Bar No. 4080891
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
T: (312) 576-3024
matt@almeidalawgroup.com
david@almeidalawgroup.com
elena@almeidalawgroup.com

*Attorneys for Plaintiff & Putative Classes*